IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

FELIX ANTONIO BORDEAUX,  ) Civil No.: 3:12-cv-01213-JE
          )
     Plaintiff, ) FINDINGS AND
          ) RECOMMENDATION
    v.    )
          )
CAROLYN W. COLVIN,    )
Acting Commissioner of Social Security, )
          )
     Defendant. )
_____)

   Lisa R. J. Porter
   KP Law LLC
   16200 SW Pacific Highway, Suite H-280
   Portland, OR 97224

     Attorney for Plaintiff


   S. Amanda Marshall, U.S. Attorney
   Adrian L. Brown, Asst. U.S. Attorney
   1000 S.W. 3rd Avenue, Suite 600
   Portland, OR 97204-2902

FINDINGS AND RECOMMENDATION - 1

Summer Stinson
Social Security Administration
Office of the General Counsel
701 Fifth Avenue, Suite 2900, M/S 221A
Seattle, WA 98104

       Attorneys for Defendant

JELDERKS, Magistrate Judge:

      Plaintiff Felix Bordeaux brings this action pursuant to 42 U.S.C. § 405(g) seeking

judicial review of a final decision of the Commissioner of Social Security (the Commissioner)

denying his applications for Disability Income Benefits (DIB) and Supplemental Security

Income (SSI) benefits under the Social Security Act (the Act). Plaintiff seeks an Order

remanding the action to the Social Security Administration (the Agency) for an award of

benefits.

      For the reasons set out below, the Commissioner's decision should be affirmed.

## Procedural Background

      Plaintiff filed applications for DIB and SSI on August 29, 2008, alleging that he had been

disabled since 2001.

      After his claims had been denied initially and on reconsideration, Plaintiff timely

requested an administrative hearing.

      On January 31, 2011, a hearing was held before Administrative Law Judge (ALJ) Steve

Lynch. Plaintiff; Gary Jeski, a Vocational Expert (VE); and Lisa Haines, Plaintiff's mother;

testified at the hearing.

      In a decision filed on February 14, 2011, ALJ Lynch found that Plaintiff was not disabled

within the meaning of the Act. That decision became the final decision of the Commissioner on

FINDINGS AND RECOMMENDATION - 2

May 7, 2012, when the Appeals Council denied Plaintiff's request for review.  In the present action, Plaintiff challenges that decision.

## Background

Plaintiff was born on May 27, 1980, and was 30 years old at the time of the ALJ's decision.  He attended special education classes through the ninth grade, and obtained a GED in 2000.  Plaintiff has work experience as an auto detailer and forklift driver, and has not worked since June 30, 2003.  Plaintiff has been incarcerated for significant periods of time, and was released from prison in April, 2008 after being imprisoned for approximately five years.

## Disability Analysis

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 C.F.R. §§ 404.1520, 416.920.  Below is a summary of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

Step One.  The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA).  A claimant engaged in such activity is not disabled.  If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two.  20 C.F.R. § 404.1520(b).

Step Two.  The Commissioner determines whether the claimant has one or more severe impairments.  A claimant who does not have such an impairment is not disabled.  If the claimant has a severe impairment, the Commissioner proceeds to evaluate the claimant's case under Step Three.  20 C.F.R. § 404.1520(c).

Step Three.  Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the

presumptively disabling impairments listed in the Social Security Administration (SSA)

regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1.  A claimant who has such an impairment

is disabled.  If the claimant's impairment does not meet or equal an impairment listed in the

regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four.

20 C.F.R. § 404.1520(d).

 Step Four.  The Commissioner determines whether the  claimant is able to perform

relevant work he or she has done in the past.  A claimant who can perform past relevant work is

not disabled.  If the claimant demonstrates he or she cannot do work performed in the past, the

Commissioner's evaluation of the claimant's case proceeds under Step Five.  20 C.F.R.

§ 404.1520(e).

 Step Five.  The Commissioner determines whether the claimant is able to do any other

work.  A claimant who cannot perform other work is disabled.  If the Commissioner finds that

the claimant is able to do other work, the Commissioner must show that a significant number of

jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this

burden through the testimony of a vocational expert (VE) or by reference to the

Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the

Commissioner demonstrates that a significant number of jobs exist in the national economy that

the claimant can do, the claimant is not disabled.  If the Commissioner does not meet this

burden, the claimant is disabled.  20 C.F.R. § 404.1520(f)(1).

 At Steps One through Four, the burden of proof is on the claimant.  Tackett, 180 F.3d at

1098.  At Step Five, the burden shifts to the Commissioner to show that the claimant can perform

jobs that exist in significant numbers in the national economy.  Id.

FINDINGS AND RECOMMENDATION - 4

## **Medical Record**

In August, 1997, Plaintiff was committed to the Oregon Youth Authority-MacLaren Youth Correctional Facility for stealing an automobile.  Records from that institution dated November 18, 1997 indicate that Plaintiff was referred for evaluation of reported suicidal ideation.  Plaintiff said that he had felt depressed "on and off" for several months, and that he felt particularly depressed and hopeless when he felt that his life was going badly.  Plaintiff reported that he had had thoughts of wanting to hang himself when he returned from "boot camp," and that those thoughts had not subsequently recurred.  He reported problems with insomnia and said that he kept to himself and did not want to be around other people.  Plaintiff also reported that he had attempted suicide approximately one year earlier, and that a friend had interceded when he was about to shoot himself.

In a letter dated April 21, 2004, Genevieve Arnaut, PsyD., PhD, noted that Plaintiff had been convicted of two counts of First Degree Criminal Mistreatment.

On July 26, 2008, Plaintiff was diagnosed with a back sprain/strain and tobacco use disorder after being involved in a motor vehicle accident.  In the low speed accident, another vehicle collided with the the passenger side of the vehicle Plaintiff was driving.  Plaintiff was wearing a seat belt, and air bags did not deploy.

During a visit to an emergency room on August 1, 2008, Plaintiff was diagnosed with Cervicalgia, pain in the spine, headache, and lumbago.  X-rays revealed no acute abnormality.

On August 21, 2008, Plaintiff again visited an emergency room with complaints of ongoing pain related to the July 26, 2008  automobile accident.  Plaintiff reported that he had

FINDINGS AND RECOMMENDATION - 5

experienced increased pain in his low back and neck during the previous three days.  No

evidence of bony injury or neurological abnormalities was found.  Back pain was diagnosed, and

pain medication and muscle relaxants were prescribed.

Dr. Amy Cowan examined Plaintiff on January 29, 2009.  She noted that Plaintiff's chief

complaints were low back pain, bilateral knee pain, and chest pain.  Plaintiff reported that he had

played football, wrestled, and participated in track and field events in high school.  Plaintiff said

that he had suffered significant back pain since his automobile accident in 2008, and that he had

been struck by an automobile while riding his bicycle approximately one month after the

automobile accident.  Plaintiff reported that this second accident had caused knee pain and

worsened his back pain, and that pain in his lower back was particularly sharp in the morning.

He stated that the pain radiated into his neck, caused shortness of breath, and was worse with

exertion.  Exercise, pain medication, muscle relaxants, and chiropractic care had helped, but had

not eliminated his pain.

Dr. Cowan observed no back pain on examination and opined that Plaintiff might be drug

seeking.  She opined that Plaintiff was in excellent physical condition and appeared to be "quite

healthy."  Dr. Cowan opined that Plaintiff could sit, stand, and walk without limitations and did

not need any assistive device.  She further opined that Plaintiff had no lifting/carrying, postural,

or manipulative limitations, and needed no environmental workplace limitations.

Karen Bates-Smith, Ph.D., a clinical psychologist, performed an intellectual assessment

on March 3, 2009.  Dr. Bates-Smith interviewed Plaintiff and administered a number of tests of

mental functioning.  Plaintiff told her that he suffered from depression, panic attacks, and anti-

social behavior, but that he had never been psychiatrically hospitalized or participated in

outpatient psychological treatment.  He reported that he made his own breakfast, fed the dogs,

showered, took care of his hygiene and grooming, vacuumed, swept, mopped, cooked, drove, and shopped without difficulty.

Dr. Bates-Smith found that Plaintiff's judgment and insight were good, and testing indicated that Plaintiff's overall intellectual functioning was in the borderline range. Dr. Bates-Smith diagnosed Depressive Disorder, NOS; Borderline Intellectual Functioning; and a History of Conduct Disorder. She opined that Plaintiff experienced panic attacks, and did not meet the criteria for an Antisocial Personality Disorder. Dr. Bates-Smith found that Plaintiff's working memory and processing speed were borderline, that he completed the examination at a normal pace, and that his task persistence was good. She opined that he had not had any episodes of decompensation or deterioration that met "SSA's criteria for decompensations."

In a Psychiatric Review Technique form dated March 10, 2009, Dr. Dora Logue, a non-examining Agency consultant assessed Plaintiff's mental functional capacity. Plaintiff was rated as moderately limited in the ability to understand and remember detailed instructions; carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. He was rated as moderately limited in the ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with co-workers or peers without distracting them or exhibiting behavioral extremes. He was also rated as moderately limited in his ability to respond appropriately to changes in the work setting, ability to use public transportation, and ability to set realistic goals or make plans independently of others.

FINDINGS AND RECOMMENDATION - 7

On the Psychiatric Review Technique form, Dr Logue noted that the medical disposition was based upon the presence of Affective Disorders (12.04) and Mental Retardation (12.05). Under the latter of these, Borderline Intellectual Functioning was noted as a medically determinable impairment that was present, but which did not precisely satisfy the relevant diagnostic criteria. Plaintiff was rated as moderately limited in the ability to maintain social functioning, concentration, persistence, or pace.

An MRI of Plaintiff's lumbar spine taken on March 24, 2009, showed a moderate sized dorsal central disc protrusion at L4/5 indenting the sac and producing mild central canal stenosis and a small dorsal central disc protrusion at L5/S1 which did not compress the sac but might contact both S1 nerves, without displacement.   Plaintiff was assessed with trigger point pain and pain in his left knee and ankle the next day.

On March 25, 2009, Plaintiff went to an emergency room with complaints of pain in his upper right back and left arm, and pain related to a dog bite sustained two weeks earlier.  He reported that he experienced occasional pain near his scapula since his motor vehicle and bicycle accidents several  months earlier.  He also complained of other residual pain experienced since those accidents.  Examination revealed no evidence of "ligamentous or bony injury" related to Plaintiff's knee pain, and Plaintiff's ankles were "nontender."  A trigger point injection provided pain relief.

At the request of Dr. Mark Peterson, x-rays of Plaintiff's left knee, lumbar spine, and thoracic spine were taken on April 18, 2009.  The x-ray of Plaintiff's knee showed mild hypertension and possible mild patella alta.  The lumbar spine x-ray showed mild narrowing of the L4-5 disc spaces and an "otherwise normal lumbar spine."  The thoracic spine x-ray showed minimal scoliosis, and no compression fracture or disc space narrowing.

FINDINGS AND RECOMMENDATION - 8

Plaintiff went to an emergency room on April 24, 2009, with complaints of continued pain in his low back and left knee.  Plaintiff's lower extremities were normal on examination, and a doctor noted that an earlier MRI had shown no significant findings.  Low back pain was assessed, and physical therapy was recommended.

Plaintiff went to an emergency room on July 9, 2009, with complaints of back and knee pain.  He reported that he had been tackled during an altercation with a police officer the previous night, and said his right knee and left shoulder had been injured.  Doctors found no evidence of fractures, and range of motion tests were normal.  Left shoulder and right knee contusions were noted, and Plaintiff was assessed with chronic back pain.  Pain medication was prescribed, and Plaintiff was advised to seek care for his chronic pain from a primary care provider.

Plaintiff complained of lower back pain, knee pain, and neck pain during a visit to Dr. Kaidong Wang on November 18, 2009.  Dr. Wang noted severe tenderness across Plaintiff's lower back and limited range of motion in the lower back.  He diagnosed a "left lumbar radiculopathy, S1 with mild motor deficits but lots of symptoms worsened by being pushed by a police officer."  Dr. Wang opined that Plaintiff was unable to work at that time, and prescribed a cane and a back brace.

Plaintiff established care with Anna Streuli, PA, on October 29, 2010.  Ms. Streuli interviewed and examined Plaintiff, and diagnosed moderate to severe depression and chronic low back and knee pain.

On December 27, 2010, Suzanne Bauer, a Physical Therapist, noted that Plaintiff used a cane and reported bilateral knee pain and low back pain.  Plaintiff said that he had pain from his

shoulder down the back, shooting down his legs, and pain and numbness in his ankles.  He rated his pain level as 10 on a scale of 10.

In notes of a session on January 5, 2011, Ms. Bauer indicated that Plaintiff's chief complaints were bilateral knee pain and low back pain, which Plaintiff said had worsened since his bicycle accident.  Plaintiff reported that he had experienced some temporary improvement with physical therapy and chiropractic care in the past, and rated his current level of pain as 11 on a 10 point scale.  Ms. Bauer indicated that Plaintiff's problems included decreased lumbar flexibility and range of motion and decreased strength in the lower extremities.  She opined that, if he followed through with his home exercise program,  Plaintiff's potential for rehabilitation was good.

In January, 2011, Plaintiff sought services from Lifeworks NW.  An unsigned Behavioral Health Assessment prepared at that time summarized Plaintiff's history and complaints.  Based upon his description of his condition and symptoms, Plaintiff was diagnosed with Generalized Anxiety Disorder and Mild Depression.  The staff member who prepared the form opined that further inquiry into Post Traumatic Stress Disorder (PTSD) should be made because Plaintiff described PTSD symptoms, including flashback memories of his automobile accident.  Plaintiff's Global Assessment of Functioning (GAF) was rated at 53.

Doran Quinn, DC, LAC, Plaintiff's treating chiropractor, completed a form dated January 27, 2011, setting out his opinion as to Plaintiff's capacity to perform various work-related functions.  Quinn opined that Plaintiff's functional capacity was significantly limited.  He reported that Plaintiff had chronic lumbar pain and lower extremity pain syndrome.  Quin opined that Plaintiff was prone to pain with prolonged standing and bending, and rated his prognosis as poor to fair.  Plaintiff's  symptoms were listed as chronic low back pain, hip pain, and leg pain

which radiated to his mid back, Quin opined that his condition was expected to deteriorate over

time. Quinn reported that Plaintiff would need to work at a reduced pace if employed full time;

that he would have difficulty with stamina, pain and fatigue; and that his ability to work 8 hour

days and 40 hour work weeks was poor. Quinn opined that Plaintiff would need to change

positions or posture during a work day; would sometimes need to lie down at unpredictable

intervals; could never twist or climb ladders; could rarely stoop; and could occasionally crouch

and climb stairs. He could occasionally lift and carry 20 pounds.

Quinn opined that Plaintiff's impairments would cause him to miss work twice per

month. He further opined that Plaintiff was extremely limited in his ability to maintain attention

and concentration, perform activities within a schedule, maintain regular attendance and be

punctual within customary tolerances, complete a normal workday and workweek without

interruptions from medically based symptoms, and perform at a consistent pace without an

unreasonable manner and length of breaks or rest periods. Quinn opined that Plaintiff had been

unable to work since August 1, 2008, because of physical problems.

An MRI of Plaintiff's left shoulder taken on May 9, 2011 showed degenerative changes

of the AC joint narrowing the supraspinatus outlets, supraspinatus and infraspinatus

tendinopathy, and a possible small partial thickness articular sided tear of the distal

supraspinatus adjacent to the rotator cuff interval. The ALJ did not have an opportunity to

review the results of this MRI because it was taken after he had issued his decision. Plaintiff

submitted the records of this MRI to the Appeals Council, which included the material in the

administrative record.

**Testimony**

FINDINGS AND RECOMMENDATION - 11

**Plaintiff**

Plaintiff testified as follows at the hearing before the ALJ.

Plaintiff injured his neck in 2001, and has difficulty turning his head to look up and down and side to side.  However, if he had a "sit down job" looking at objects on a bench or table would not be a problem.

Plaintiff also started having problems with his back in 2001.

Plaintiff was incarcerated for approximately 5 years after he had an accident in which his child "got a little burn " while Plaintiff was bathing him.  Plaintiff was released from prison in April, 2008.  His parole was ended, and he had attended college for a time after being released.  He  was unable to continue his college studies because he cannot sit for more than 15 minutes at a time.  He had completed "maybe one semester" before the pain began.

Plaintiff was involved in two accidents in 2008.  After he had nearly healed from the first accident, a motor vehicle collision,  he was hit while riding on a bicycle.  He could not continue his studies after the second of these accidents because at the school he attended "they have stairs and stuff like that."  Plaintiff had been doing well in school, but his girlfriend, who "wasn't the best of choices at the time," told him that he should postpone his studies because he could not sit and concentrate through long classes.

Plaintiff experiences significant back pain every day.  The pain radiates from his low back up through his neck and down through his legs.  Plaintiff wakes with back pain every day.  He also has knee pain that requires him to carry a cane.  Knee pain, which began after the first accident in 2008, makes it difficult for Plaintiff to stand and walk: He needs to stop and rest after walking two blocks, and can stand only 15 to 20 minutes at a time.  Plaintiff can sit in an office chair for approximately 10 minutes at a time without needing a break, and thinks that, if he were

allowed to take all the breaks he needed, he could sit for a total of 2 to 3 hours during an 8 hour work day.  Sharp pain radiating into his ankles sometimes forces Plaintiff to stop and sit when he is walking.   Plaintiff alternates between sitting, walking, and standing every 10 minutes throughout the day.

Two or three times per week, Plaintiff suffers headaches of such severity that he "cannot function at all" and must lie down with his eyes closed.  These headaches are often preceded by episodes of dizziness.

Plaintiff has suffered from depression since 1990.  He does not want to do anything other than go to his doctor's appointments "and come home and relax."  He has lost 20 to 30 pounds since his last accident because pain suppresses his appetite.  Sometimes Plaintiff's mother must force him to eat.  Depression and pain make sleep difficult and sap his energy level.  Plaintiff sometimes must drink Red Bull "to get going" in the morning.  Pain interferes with Plaintiff's concentration and attention, and he sometimes feels worthless because he is not working and cannot help around the house.  Because of the pain, Plaintiff has "crying spells" once or twice per week.  He also experiences weekly panic attacks, and experiences periods of anger and irritability "every other day or so."

Doctors have told Plaintiff not to work because work related activities will exacerbate his back injury.  Plaintiff's hands become numb, and Plaintiff experiences swelling in his knees and back every day.  He often has muscle spasms in his back and legs, and he sometimes falls because of muscle cramps.  Plaintiff's  physical therapist advised him to use a cane.  Before he started using the cane, Plaintiff fell "maybe twice a week."  He has difficulty climbing and descending stairs, and needs to take breaks lasting from 10 minutes to a half hour 5 to 10 times a day.

Plaintiff used to go to movies with friends, play basketball, lift weights, and practice martial arts, but can no longer engage in these activities.  A recliner is the most comfortable chair for Plaintiff, and he spends 3 or 4 hours a day lying down or reclining.  Plaintiff has difficulty pushing or pulling objects such as a vacuum sweeper.  Other people help Plaintiff with household chores and shopping.  Because of pain, he is "unable to function and do things" 90% of the time.

**Lay Witness Testimony**

1. **Lisa Haines**

Lisa Haines, Plaintiff's mother, testified as follows at the hearing.

Because of problems with his knees, Plaintiff has difficulty walking, and can walk only about two blocks at one time.  Plaintiff has difficulty holding and lifting objects.  He cannot support a bag of groceries, and sometimes drops his knife or fork.

Plaintiff suffers pain daily, and seems to be in pain 90% of the time.  He fatigues easily, and is worn out by activities such as sitting, walking, and standing.  Plaintiff has difficulty going up and down stairs and preparing meals, and Ms. Haines does most of the household chores.  It takes Plaintiff 15 to 20 minutes to make a sandwich, and he then needs to take a break.

Plaintiff performs tasks 50% slower than "a normal person," and  has problems with concentration, attention, and memory.  He has "crying spells" lasting 10 to 20 minutes approximately once a month.  Plaintiff also has problems with temper and irritability, and experiences headaches that interfere with his ability to function once or twice per month.  Ms. Haines helps Plaintiff with grooming and personal hygiene because numbness in Plaintiff's hands makes it difficult for him to carry out these activities.

2. **Dennis McMurray**

Dennis McMurray, a friend of Plaintiff, submitted a third-party witness statement describing Plaintiff's functioning as follows.

McMurray has known Plaintiff for 12 years.  He  has noticed that Plaintiff is less communicative and more distant since his bicycle accident.  Plaintiff used to play sports and "hang out" with his friends but has mostly stayed home and secluded himself since the accident. Plaintiff's mother helps Plaintiff with his daily grooming chores: She combs his hair, helps him on "trips to the bathroom," and ties his shoes.  She also does most of the cleaning, cooking, and shopping, and has basically been Plaintiff's care giver during the previous two years.

Before he was injured, Plaintiff attended school, studying psychology.  Since his accident, Plaintiff has stopped attending school.  He takes medication for depression and attends counseling sessions.  Plaintiff continues to like to "work on" music, watch movies, play video games, and read books.

Plaintiff's health appears to have deteriorated since his bicycle accident.  He is in pain every day; his knees hurt when he walks and his back "locks up" on him, after which his mother must "massage him to the point where he can move."  Plaintiff's depression appears to contribute to his pain.

**Vocational Expert**

The ALJ posed a vocational hypothetical describing an individual of Plaintiff's age and education who could perform a full range of light exertional level work and was limited to simple entry level work requiring no interaction with the public and only occasional interaction with coworkers.  The VE testified that such an individual could perform light janitorial work and could work as a small products assembler.  He further testified that imposition of a "sit/stand" option would eliminate the janitorial position and would reduce the number of small products

FINDINGS AND RECOMMENDATION - 15

assembler positions available.  The VE testified that the use of a cane or other assistive device would not interfere with work as a small products assembler if the individual did not need the device to simply stand at a work station.

In response to questioning by Plaintiff's counsel, the VE testified that an individual who was non-functional up to 1/3 of the time or who was only 2/3 as capable as the average worker in a number of areas would not be able to sustain employment.  He further testified that the inability to maintain concentration, persistence, and pace 1/3 of the time, or the functional limitations to which Plaintiff testified, would eliminate employment.

### ALJ's Decision

The ALJ found that Plaintiff met the insured status requirements for DIB coverage through September 30, 2003.

At the first step of his disability analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset of disability on January 1, 2003.

At the second step, the ALJ found that Plaintiff's degenerative disc disease, borderline intellectual function, and depression were severe impairments.

At the third step, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled a presumptively disabling impairment set out in the listings, 20 C.F.R. Part 404, Subpart P., App.1.

The ALJ next assessed Plaintiff's residual functional capacity (RFC).  He found that Plaintiff retained the capacity to perform light exertional level work, except to the extent that he was limited to simple, entry-level work with no interaction with the public and only occasional interaction with coworkers.  The ALJ found that Plaintiff was credible to the extent that he suffered from the impairments noted in the ALJ's decision, but that his allegation "that he is

incapable of all work activity" was not credible "as the evidence in the record reflects the claimant's functional limitations are not as significant and limiting as have been alleged."

At the fourth step, the ALJ found that Plaintiff had no past relevant work.

Based upon the VE's testimony, at the fifth step, the ALJ found that Plaintiff could perform jobs that existed in substantial numbers in the national economy. The ALJ cited janitor and small products assembly positions as examples of work Plaintiff could perform. Because he found that Plaintiff could perform such work, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act.

## **Standard of Review**

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Claimants bear the initial burden of establishing disability. Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996). The Commissioner bears the burden of developing the record, DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991), and bears the burden of establishing that a claimant can perform "other work" at Step Five of the disability analysis process. Tackett, 180 F.3d at 1098.

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews, 53 F.3d at 1039. The court must weigh all of the evidence, whether it supports or

detracts from the Commissioner's decision.  Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir.

1986).  The Commissioner's decision must be upheld, however, even if "the evidence is

susceptible to more than one rational interpretation."  Andrews, 53 F.3d at 1039-40.

### Discussion

Plaintiff contends that the ALJ erred by failing to credit the testimony of his mother and

the statements provided by his friend, Dennis McMurray.  He also contends that the ALJ failed

to accurately assess his residual functional capacity, and erred in concluding the he could

perform "other work" at step five of the disability analysis.

### I. **ALJ's Evaluation of Evidence From Lay Witnesses**

### A. **Lisa Haines**

As noted above, Lisa Haines, Plaintiff's mother, testified that Plaintiff was severely

impaired, experienced chronic pain, and needed significant assistance in carrying out his

activities of daily living.  The ALJ gave her testimony little weight on the grounds that it, like

Plaintiff's own testimony, was "inconsistent with the preponderance of medical opinions,

laboratory findings, medical examinations and the claimant's reported activities of daily living."

He added that Ms. Haines could not "be considered a disinterested third party witness whose

testimony would not tend to be colored by affection for the claimant and a natural tendency to

agree with the symptoms and limitations the claimant alleges."

Lay testimony describing a claimant's apparent symptoms and activities is competent

evidence which must be considered, e.g.,  Molina v. Astrue, 674 F.3d 1104, 1114 (9th Cir. 2012)

(citing Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1995)), and an ALJ must provide

"germane" reasons for rejecting such evidence.  Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir.

1993).

Plaintiff contends that the ALJ failed to provide sufficient support for his decision to discount Ms. Haines' testimony, and particularly erred in rejecting her testimony because of her familial relationship with Plaintiff.

The latter of these arguments is well taken.  As the Commissioner acknowledges, the ALJ erred in rejecting Ms. Haines' testimony in part because of her close relationship with Plaintiff.  Family members in a position to observe a claimant's symptoms and activities are competent to testify as to a claimant's condition, Dodrill v. Shalala, 12 F.3d 915, 918  (9th Cir. 1993) (citing Sprague v. Bowen, 812 F.3d 1226, 1232 (9th Cir. 1987)), and an ALJ cannot reject a witness's testimony on the grounds that he or she is a family member.  Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996)

Though the ALJ erred in discounting Ms. Haines' statements in part because of her relationship to Plaintiff, this error was harmless for at least three reasons.  First, any error in evaluating lay witness testimony is harmless if that testimony "is contradicted by more reliable medical evidence that the ALJ credited."  Molina v. Astrue, 674 F.3d 1104, 1118-19 (9th Cir. 2012).  Here, the ALJ rejected Ms. Haines' testimony in part on the grounds that it was inconsistent with the "preponderance" of the medical evidence, which the ALJ cited at length and thoroughly discussed in his decision.  Second, where a third party witness testifies to the same limits testified to by the claimant, and the claimant's testimony is properly discounted, the reasons for discrediting the claimant's testimony also apply to the third party witness's testimony.  Molina v. Asture, 679 F.3d 1109, 1122 (9th Cir. 2012); Valentine v. Commissioner, 574 F.3d 685, 694 (9th Cir. 2009) (where ALJ has properly discounted claimant's credibility, failure to reassess third party witness statement as to same limitations not error).  Here, Ms. Haines' description of Plaintiff's symptoms and limitations largely reiterated Plaintiff's own

testimony.  The ALJ provided clear and convincing reasons, which were supported by substantial evidence in the record for discounting Plaintiff's testimony, and Plaintiff has not challenged the ALJ's evaluation of his credibility.  Third, the ALJ rejected Ms. Haines' testimony in part on the grounds that it was inconsistent with Plaintiff's "reported activities of daily living."  The ALJ had discussed those activities at length elsewhere in his decision. His conclusion that they were inconsistent with the degree of impairment to which Ms. Haines testified was reasonable and constituted a "germane" reason for rejecting her testimony.  See, e.g., Carmickle v. Commissioner, 533 F.3d 1155, 1163-64 (9th Cir. 2008) (inconsistency between claimant's activities and lay witness's statements is germane reason for discrediting the lay witness).

## B. **Dennis McMurray**

The lay witness statement submitted by Dennis McMurray is summarized above. McMurray, like Ms. Haines, asserted that Plaintiff was severely impaired and needed substantial assistance performing personal grooming and activities of daily living.  He described Plaintiff as significantly less active and more reclusive than he had been before his bicycle accident.

The ALJ found that McMurray's statement was "generally credible when corroborated by objective evidence," but that, though Plaintiff might be "less active and more reclusive" than he was before his bicycle accident, the "objective medical evidence" did not support the level of impairment McMurray reported.  In support of this conclusion, the ALJ cited Plaintiff's own reports to consultative examiners concerning his activities of daily living.  He added that the "leisure activities" McMurray cited suggested "abilities greater than the claimant himself alleged."

The ALJ provided germane reasons for his decision to not fully credit McMurray's statements concerning Plaintiff's functional limitations.   His assertion that the objective medical evidence was inconsistent with McMurray's statements was supported by substantial evidence he cited and discussed at length elsewhere in his decision.  In addition, the ALJ cited Plaintiff's own reports to examining doctors concerning his activities of daily living, and those reports are consistent with the ALJ's conclusion that Plaintiff was significantly less impaired than McMurray indicated.  This was a germane and sufficient reason for discrediting McMurray's description of Plaintiff's limitations.  See id.

## II. **ALJ's Residual Functional Capacity Assessment; Step 5 Analysis**

Plaintiff contends that the ALJ failed to include all of his impairments in the RFC assessment, failed to assess his "work related abilities on a function-by-function basis" as required by SSR 96-8p, failed to account for "limitations identified by the treating medical providers, the lay witnesses, or Plaintiff, or even the Agency's own consultative examiner," and failed to incorporate all of his limitations in the vocational hypothetical posed to the VE.

## **ALJ's RFC Assessment**

As noted in the summary of medical evidence above, in a Psychiatric Review Technique ("special technique") form dated March 10, 2009,  Dr. Logue, a non-examining Agency consultant, rated Plaintiff as moderately limited in a number of areas.  Plaintiff contends that the ALJ erred in failing to incorporate those limitations in his RFC assessment and failed to account for them in evaluating his ability to work at step five of the disability analysis.

The Commissioner contends that Plaintiff's argument "conflates the ALJ's listings analysis at step three and the ALJ's residual functional capacity assessment relevant to steps four and five."  I agree.  As the Commissioner correctly notes, a claimant's allegations of severe

mental impairment requires application of the analysis provided in a "special technique."  20

C.F.R. §§ 404.1520(a), 416.920a(a).  Pursuant to the special technique, relevant symptoms,

signs, and medical findings are evaluated to determine whether the claimant has any medically

determinable mental impairments.  20 C.F.R §§ 404.1520a(b)(1), 416.920a(b)(1).  If such

impairments are shown, the ALJ specifies the evidence establishing the existence of the

impairments and evaluates the claimant's degree of functional limitation.  20 C.F.R.

404.1520a(b)(1), 416.920 a(b)(1).  As part of step three of the disability analysis, the ALJ

identifies the existence of any potentially disabling mental impairment under the "A" criteria.  If

such an impairment is established, the ALJ then evaluates the general severity of the impairment

under the "paragraph B" criteria.  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(A).

        The ALJ's residual functional capacity (RFC) assessment is separate and distinct from

the special technique analysis.  See  20 C.F.R. §§ 404.1520a(b)(1), 404.1546(c), 416.920a(b)(1),

416.946(c); SSR 96-8p.  As the ALJ noted in his decision, the limitations identified in the "B"

criteria "are not a residual functional capacity assessment but are used to rate the severity of

mental impairments at step 2 and 3 of the sequential evaluation criteria."  Tr.  21.  See, e.g.,

Dodds v. Astrue, CV No. 3:09-cv00332-AC, slip op. at 6 (D. Or. Dec. 28, 2010), available at

2010 WL 5662968 at *3 (B criteria used to determine whether impairment is severe enough to

require RFC assessment, not to determine Claimant's RFC).  Therefore, the ALJ did not err in

omitting from the RFC assessment the specific finding set out in the special technique, even

though his RFC assessment "reflect[ed] the degree of limitation"  found in the special technique

analysis.  Tr. 22.

        As the ALJ noted in his decision, Dr. Logue found that Plaintiff

could follow simple instructions.  He has less than substantial limitations to relate to
others, less than substantial limitations in concentration, persistence and pace at
simple work activities and less than substantial limitations to adapt to changing
conditions of simple work activities.

Tr. 25 (citing Dr. Logue's assessment at Tr. 348).  In his RFC assessment, the ALJ limited

Plaintiff to "simple, entry-level work with no interaction with the public and occasional

interaction with coworkers."

 Plaintiff contends that this limitation does not adequately account for the deficiencies in

concentration, persistence, and pace noted in Dr. Logue's assessment.  I disagree.  In <u>Stubbs-

Danielson v. Astrue</u>, 539 F.3d 1169, 1174 (9th Cir. 2008), the court concluded that limiting a

claimant to simple tasks could adequately address relevant mental limitations and limitations of

pace if that limitation was consistent with the claimant's restrictions identified in the medical

record.  In <u>Gillock v. Astrue</u>, CV 09-6370-JE (D. Or. June 29, 2011) available at 2011 WL

4916499 at *5, I cited that decision in support of my conclusion that a limitation to simple,

routine tasks sufficiently accounted for the plaintiff's limited ability to maintain concentration,

persistence, or pace.

    In the present action, a careful review of the medical evidence and the ALJ's decision

supports the conclusion that the ALJ's RFC adequately accounted for Plaintiff's mental

limitations, including the "less than substantial limitations in concentration, persistence and pace

at simple work activities" identified by Dr. Logue.  The ALJ fully reviewed the medical

evidence, and his conclusion that the RFC assessment accurately accounted for Plaintiff's

limitations is supported by substantial evidence in the record, including the records of his

treating and examining doctors.

**ALJ's Step Five Analysis**

In order to be accurate, an ALJ's vocational hypothetical presented to a VE must set out all of a claimant's impairments and limitations.  E.g., Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984).  The ALJ's depiction of a claimant's limitations must be "accurate, detailed, and supported by the medical record."  Tackett v. Apfel, 180 F.3d 1094, 1101 (9th Cir. 1999).  If the assumptions set out in the hypothetical are not supported by the record, a VE's conclusion that a claimant can work does not have evidentiary value.  Gallant, 753 F.3d at 1456.

A careful review of the ALJ's decision supports the conclusion that the ALJ did not err in concluding, at step five of his analysis, that Plaintiff could perform jobs that existed in substantial numbers in the national economy.   After he had concluded at step three of the disability analysis that Plaintiff's severe impairments were not disabling, the ALJ was required to assess Plaintiff's residual functional capacity (RFC) before continuing with the sequential disability analysis.  A claimant's RFC is the most that the claimant can do, considering relevant impairments and limitations.  SSR 96-8p.  This determination is to be made based upon the evidence as a whole.  20 C.F.R. §§ 404.1546, 416.946.  If the ALJ has applied the proper legal standard and the decision is supported by substantial evidence, the RFC assessment must be affirmed.  E.g., Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005).

Here, Plaintiff has not disputed the ALJ's determination that he was not wholly credible, and as discussed above, the ALJ provided sufficient reasons for discounting the testimony of lay witnesses.  The ALJ thoroughly summarized and evaluated relevant medical evidence in the record, and his RFC assessment was supported by substantial evidence cited in his decision.  In determining that Plaintiff could perform jobs that existed in substantial numbers in the national economy, the ALJ relied on the VE's response to a vocational hypothetical that included all of

the limitations that the ALJ found were credible and supported by substantial evidence in the record.  That reliance was proper.  E.g., id. At 1217-18.

## Conclusion

The Commissioner's decision should be AFFIRMED, and this action should be dismissed with prejudice.

## Scheduling Order

This Findings and Recommendation will be referred to a district judge.  Objections, if any, are due August 22, 2013.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 5th day of August, 2013.


    /s/ John Jelderks
John Jelderks
U.S. Magistrate Judge


FINDINGS AND RECOMMENDATION - 25